UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TERRI LYNN REAVES, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04171-JMS-TAB |
| | ) | |
| MAXIMUS INCORPORATION, | ) | |
| | ) | |
| *Defendant*. | ) | |

## <u>**ORDER**</u>

*Pro se* Plaintiff Terri Lynn Reaves, who is African American and has suffered from various illnesses, was an Enrollment Broker at Defendant Maximus, Inc. ("<u>Maximus</u>").[1] After Ms. Reaves resigned, she initiated this litigation and asserts claims against Maximus for retaliation under the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("<u>FMLA</u>"), discrimination and retaliation under the Americans With Disabilities Act, 42 U.S.C. § 12181, *et seq.* ("<u>ADA</u>"), and discrimination and hostile work environment under Title VII of the Civil Rights Act of 1964 ("<u>Title VII</u>"). Maximus has filed a Motion for Summary Judgment, [Filing No. 31], and Ms. Reaves has filed an Objection to Declaration of Courtney Glover, [Filing No. 37], both of which are ripe for the Court's consideration.

---

[1] Ms. Reaves names "Maximus Incorporation" as the Defendant in this matter, however various filings indicate that the proper entity is "Maximus, Inc." The Clerk is **DIRECTED** to change the name of the Defendant from "Maximus Incorporation" to "Maximus, Inc." on the docket.

# I.
## MS. REAVES'S OBJECTION TO DECLARATION OF COURTNEY GLOVER

At the outset, the Court addresses Ms. Reaves's Objection to Declaration of Courtney Glover because it will determine the evidence that the Court will consider when analyzing Maximus's Motion for Summary Judgment.

### A.      Background

Courtney Glover has been a Senior Specialist in Human Resources at Maximus since June 2018. [Filing No. 31-2 at 2.] In her Declaration, Ms. Glover provides certain information regarding Maximus's consideration of Ms. Reaves for a supervisor position, and the decision to ultimately promote another Maximus employee to that position. [Filing No. 31-2 at 3.] Ms. Glover also discusses the application and hiring process for a training manager position at Maximus, and data entry errors with Maximus's Human Resources system, Workday. [Filing No. 31-2 at 4.]

### B.      Discussion

In her Objection, Ms. Reaves argues that Ms. Glover has not shown that she is competent to testify, that she has not attached records to support her conclusions, and that her statement that she was unaware that Ms. Reaves had any medical conditions or that Ms. Reaves had been approved for and was taking FMLA leave is untrue. [Filing No. 37 at 1.]

In response, Maximus argues that Ms. Glover specifically avers in her Declaration that she is competent to testify and that all of her statements are within her personal knowledge. [Filing No. 40 at 2.] It asserts that Ms. Glover was not required to attach documentary evidence to her Declaration, and that Ms. Glover's testimony is consistent with the evidence. [Filing No. 40 at 2-3.]

Ms. Reaves did not file a reply.

Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. Ms. Glover states in her Declaration that she is of sound mind and competent to testify as to all matters contained in her Declaration, and that all of those matters are within her personal knowledge. [Filing No. 31-2 at 1.] This is sufficient to show that she has personal knowledge of the matters discussed in her Declaration, and there is no requirement that she also submit documents to support her testimony. As to whether the statements in her Declaration are truthful, such an argument would not invalidate Ms. Glover's Declaration, but rather is an argument that Ms. Reaves can make in response to Maximus's Motion for Summary Judgment, bolstered by her own evidence. And, in any event, as discussed below, Ms. Glover's statements are ultimately consistent with the other record evidence in this case.

Ms. Reaves's Objection is without merit, and is **OVERRULED**. The Court will consider Ms. Glover's Declaration in analyzing Maximus's Motion for Summary Judgment.

## II.
### MAXIMUS'S MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce

3

admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the granting of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. Hampton v. Ford Motor Co., 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. Harper v. Vigilant Ins. Co., 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Darst v. Interstate Brands Corp., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." Johnson, 325 F.3d at 898. Any doubt as to the

existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

### B.    Statement of Facts

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### 1.    Maximus's Business

Maximus is a company that partners with federal, state, and local governments to assist in delivering health and human services programs. [Filing No. 31-2 at 2.] Maximus works with the Indiana state government to provide resources for several state-funded health insurance programs including the Healthy Indiana Plan, Hoosier Healthwise, and Hoosier Care Connect, along with the Medicaid program. [Filing No. 31-1 at 5-6.]

### 2.    Ms. Reaves's Initial Employment With Maximus

Ms. Reaves began working for Maximus as an Enrollment Broker in October 2008, while working through a temporary agency. [Filing No. 31-1 at 5.] After working through the temporary agency for nine months, Maximus hired Ms. Reaves as a permanent employee in the Enrollment Broker position. [Filing No. 31-1 at 5.] As an Enrollment Broker, Ms. Reaves's job duties included receiving inbound calls from and making outbound calls to insurance program members to provide members with information regarding their insurance coverage. [Filing No. 31-1 at 5-6.] Ms. Reaves also trained new Enrollment Brokers by having them shadow her. [Filing No. 31-1 at 6.]

### 3.    *2012-2013 Training Position Offer*

In 2012 or 2013, Maximus offered Ms. Reaves a training position. [Filing No. 31-1 at 7; Filing No. 31-1 at 19-20.] Ms. Reaves declined the training position because it did not involve a raise. [Filing No. 31-1 at 19.] The employee who ultimately accepted the training position also did not receive a raise, but took the position "just to be off the phone." [Filing No. 31-1 at 28.]

### 4.    *2015-2017 Race-Related Comments*

In 2016 or 2017, one of Ms. Reaves's co-workers, Stacy, showed Ms. Reaves a picture of a little girl. [Filing No. 31-1 at 13.] Ms. Reaves commented that the girl, who was of mixed race, was pretty and asked who she was. [Filing No. 31-1 at 13.] Stacy responded that it was the granddaughter of a supervisor, Debbie, but asked Ms. Reaves not to tell Debbie that Stacy had shown her the picture because Debbie would "go off" because the granddaughter is Black. [Filing No. 31-1 at 13.]

Additionally, sometime between 2015 and 2017 Ms. Reaves overheard Debbie say "[i]t is about time that they hired some white people in here." [Filing No. 31-1 at 11.]

### 5.    *2017 FMLA Leave*

Ms. Reaves has several medical conditions, including fibromyalgia, diabetes, anxiety, and depression. [Filing No. 31-1 at 22.] In March 2017, Ms. Reaves requested FMLA leave related to her fibromyalgia and anxiety, and Maximus approved intermittent leave for six months. [Filing No. 31-1 at 22-23.] Maximus eventually certified her leave once every year and she was approved for intermittent FMLA leave for the remainder of her employment with Maximus. [Filing No. 31-1 at 22-23.] Ms. Reaves took a varied amount of time off each month, but typically she would take three to four days off a month and "[m]aybe more, depending on how [she] was feeling." [Filing No. 31-1 at 23.]

6.    *Call Center Restructuring and Supervisor Position*

In June 2018, Maximus restructured its call center staff by eliminating the team lead positions and creating an additional supervisor position.  [Filing No. 31-2 at 2.]  All employees were informed that they could apply for the supervisor position, including the former team leads.  [Filing No. 31-2 at 2.]  Two team leads decided to take a severance package and leave Maximus, and both told Ms. Reaves that they believed Maximus had already decided to hire another team lead, Greg Gadson, for the new supervisor position.  [Filing No. 31-1 at 19-20; Filing No. 31-2 at 3.]  Mr. Gadson is African American.  [Filing No. 31-1 at 20.]

Ms. Reaves, Mr. Gadson, and several other Maximus employees applied for the supervisor position.  [Filing No. 31-2 at 3.]  On June 27, 2018, Ms. Reaves wrote an email to Ms. Glover stating:

> I am interested in the [supervisor] position because I'm definitely a team player, and have been looking for growth thru the company for some time now.  I do believe patience is a virtue.  I'm dedicated to my job despite of many obstacles, I've been here almost 10 yrs.  I believe I can be a true asset as a leader that the reps can speak with and work with in the different issues that come about.
>
> My greatest accomplishment is that I have endured a lot of life's punches here at Maximus and I still remain as a team player.  I've avoided confrontations with members by listening first.  I've [m]ade 100% customer service scores for as long as I can remember.  I wanted to be the best rep I could be.  I wanted to be as helpful as possible no matter the tone I was getting in return from the members.  I've done that with no regrets.

[Filing No. 23 at 6.]

On the day of her interview for the supervisor position, Ms. Reaves overheard Ms. Glover tell Natalie Smith, Project Manager at Maximus, that they would be interviewing Ms. Reaves.  [Filing No. 31-1 at 19.]  Ms. Reaves overheard Ms. Smith say "Why?  Why would we interview her?  She don't even come to work.  Why?"  [Filing No. 31-1 at 19.]  Ms. Reaves overheard Ms. Glover respond to Ms. Smith "[b]ecause she has a right."  [Filing No. 31-1 at 19.]   Ms. Reaves

then called Ms. Glover to her work area and said she did not want the position because Ms. Smith did not want to work with her. [Filing No. 31-1 at 19.] Ms. Glover again said that Ms. Reaves had the right to interview for the position, and encouraged Ms. Reaves to delete an email that she was drafting to Ms. Smith and to move forward with the interview process. [Filing No. 31-1 at 19.]

Ms. Glover and Ms. Smith interviewed the candidates, including Ms. Reaves, and ultimately selected Mr. Gadson for the supervisor position. [Filing No. 31-2 at 3.] Mr. Gadson was selected because he had already been a team lead, was running the call center without any supervision for four hours each day, was performing well in the position, and had proven himself capable of supervisory duties. [Filing No. 31-2 at 3.] Additionally, Mr. Gadson had worked for Maximus since September 2009, and had proven himself as both an Enrollment Broker and a team lead. [Filing No. 31-2 at 3.] Mr. Gadson was also dependable and always volunteered to take on additional tasks, including coming in on Saturdays and handling call escalations. [Filing No. 31-2 at 3.] Finally, Mr. Gadson provided the best answers during the interview process, particularly with respect to how he would improve the call center if he was hired for the supervisor position. [Filing No. 31-2 at 3.] While Ms. Reaves's interview went well, she did not have well-thought-out ideas on how she could improve the call center. [Filing No. 31-2 at 3.] Also, although she had some limited supervisory experience, it was in the retail industry and was from the early 2000s. [Filing No. 31-1 at 40; Filing No. 31-2 at 3.]

At the time that the decision was made to hire Mr. Gadson for the supervisor position, Ms. Glover did not know that Ms. Reaves had been approved for FMLA leave or was taking FMLA leave, or that she had any medical conditions. [Filing No. 31-2 at 3.] Ms. Glover and Ms. Smith did not discuss Ms. Reaves's FMLA leave or medical conditions when they made the decision to

hire Mr. Gadson for the supervisor role, nor were those issues that they considered in deciding who to hire for that position. [Filing No. 31-2 at 3.]

### 7.    *2018 Training Manager Position*

In late 2018, a training manager position became available at Maximus. [Filing No. 31-2 at 4.] Maximus accepted applications for the position from both internal and external candidates, and interviewed three internal applicants and one external applicant. [Filing No. 31-2 at 4.] Ms. Reaves did not apply for the training manager position. [Filing No. 31-2 at 4.] Maximus ultimately hired Michelle Pope, who is African American, for the training manager position because she had the most training experience of the four candidates interviewed, and Ms. Glover and Ms. Smith believed that a "new" employee might be perceived better than the three internal applicants because the role required the training manager to perform subjective reviews of employee calls. [Filing No. 31-1 at 20; Filing No. 31-2 at 4.]

### 8.    *Data Entry Management Position*

A data entry management position also became available at Maximus. [Filing No. 31-1 at 21.] The position entailed doing data entry work, and did not involve being on the phone. [Filing No. 31-1 at 9.] It was not a supervisory role, and Ms. Reaves did not apply for it because it did not include a pay raise. [Filing No. 31-1 at 21.] Maximus hired Robin Godines for the data entry management position. [Filing No. 31-1 at 21; Filing No. 31-1 at 28.] Ms. Godines was formerly an Enrollment Broker, and had utilized FMLA leave during her employment with Maximus. [Filing No. 31-1 at 21; Filing No. 31-1 at 28.]

### 9.    *Amount of Special Project Work*

Enrollment Brokers, in addition to their normal duties, could also be assigned "special project work." [Filing No. 31-1 at 6-7.] Special projects included entering change of health care

requests into the system and making outbound calls to members who had not yet selected a plan. [Filing No. 31-1 at 7.]  Maximus supervisors decided which Enrollment Brokers should be assigned special project work, although Debbie VanMeter most often assigned special project work because she was the first supervisor to arrive in the office. [Filing No. 31-1 at 7.]  Many Enrollment Brokers wanted to do special project work because it gave them a break from being on the phones. [Filing No. 31-1 at 9-10.]

Ms. Reaves, along with several other Enrollment Brokers including Stephanie West, Regina Robinson, Tona Hill, Robin Godines, and "Liz," were assigned special project work. [Filing No. 31-1 at 8.]  Ms. West and Ms. Robinson are African American, and Ms. Hill, Ms. Godines, and Liz are all white. [Filing No. 31-1 at 8.]  Ms. Reaves received special project work once or twice a week. [Filing No. 31-1 at 9.]  Liz received special project work every day, but she is bilingual which was an asset for special project work because she could communicate with Spanish-speaking members. [Filing No. 31-1 at 9.]  Ms. Godines also received special project work almost every day, but she went "above and beyond" her job expectations and "did everything they wanted her to do." [Filing No. 31-1 at 9.]  Ms. Reaves also observed that Ms. Hill received a lot of special project work. [Filing No. 31-1 at 9.]  Although Ms. West did not receive much special project work, Ms. Robinson did so "quite often." [Filing No. 31-1 at 10.]

### 10.   Compensation Data Error

In early 2019, Maximus switched its human resources system to Workday. [Filing No. 31-2 at 4.]  Subsequently, data errors occurred when Maximus's compensation data was imported into the new system, resulting in errors regarding employees' quarterly bonuses. [Filing No. 31-2 at 4.]  Several employees, including some in Indiana, approached Maximus management about bonus history documents that reflected bonuses that were never owed or paid to the employee. [Filing

No. 31-2 at 4.]  Because the data entry error affected so many employees, and Maximus had received so many inquiries about the error, Maximus corporate sent a memorandum out to all Human Resources employees explaining that the bonus amounts shown were inaccurate due to incorrect data being transferred into Workday.  [Filing No. 31-2 at 4.]  When Ms. Reaves approached Ms. Glover about the bonus sheet, Ms. Glover explained to her that the sheet reflected incorrect information due to a glitch with data being transferred to Workday.  [Filing No. 31-1 at 33; Filing No. 31-2 at 4.]

   11. *Ms. Reaves's Early 2019 Evaluations*

   In February 2019, Mr. Gadson rated Ms. Reaves a "3" for attendance (signifying "meets expectations") and wrote "Good job!" on the attendance portion of the evaluation.  [Filing No. 23 at 29; Filing No. 31-1 at 32.]  In March 2019, Mr. Gadson rated Ms. Reaves a "2" for attendance (signifying "below expectations") because Ms. Reaves was tardy twice in a week.  [Filing No. 23 at 28; Filing No. 31-1 at 31-32.]  Ms. Reaves believed she had made up for the times she was tardy by working longer.  [Filing No. 31-1 at 31-32.]  Ms. Reaves believes that her quarterly bonus was impacted by not receiving "5"s for attendance in February and March 2019.  [Filing No. 31-1 at 32.][2]

   12. *Maximus's April 2019 Request for Updated Medical Documentation From Ms. Reaves*

   On April 30, 2019, Ms. Glover asked Ms. Reaves in an email to provide updated medical documents related to her requested accommodation that she be allowed to periodically move around, writing:

---

[2] Ms. Reaves submitted documents indicating that she received consistently favorable evaluations in December 2019, and July, August, and September 2019.  [Filing No. 23 at 7-22.]

> Hey Terri,
>
> Happy Tuesday. We are in the process of re-doing our accommodations for the WFM system and I noticed that we do not have any updated documents for you. Are you able to get me an updated accommodation notice from your physician? With the new system we need to strive for set break times. We are happy to work with you on breaking up your 30 minutes but we need to have something more set going forward. Let me know if you have any questions or would like to discuss.

[Filing No. 23 at 25; *see also* Filing No. 31-1 at 34.] The medical note supporting this accommodation had been on file with Maximus for years, and Ms. Reaves's physician eventually provided her with an updated note related to the requested accommodation. [Filing No. 31-1 at 34-35.] Once Ms. Reaves submitted the updated medical note to Maximus, the issue was resolved. [Filing No. 31-1 at 35-36.]

13. *Ms. Reaves's May to June 2019 Leave of Absence*

Ms. Reaves began a leave of absence on May 20, 2019 due to increased anxiety and depression resulting from the death of a relative. [Filing No. 31-1 at 24-25.] When she returned from her leave of absence on June 20, 2019, MetLife, Maximus's third-party leave administrator, had not fully processed her leave request because her doctor had not yet turned in the medical certification. [Filing No. 31-1 at 24; Filing No. 31-2 at 4.] Ms. Reaves had only been approved for leave from June 4, 2019 to June 19, 2019, and Maximus issued Ms. Reaves a written warning for the unapproved time off, which stated:

> This document serves as a summary of our meeting and as a formal final warning. The continually unacceptable level of proficiency in skill areas critical to your position's successful contribution to project objectives is jeopardizing the future of your employment relationship with MAXIMUS.
>
> Since May 20th, 2019, you have failed to meet attendance standards.

[Filing No. 23 at 26; *see also* Filing No. 1-7; Filing No. 31-1 at 36.] The written warning listed the dates of Ms. Reaves's unexcused absences (May 20 through May 24, 2019, May 27 through

31, 2019, and June 3, 2019), and stated that "[c]ontinued performance in this manner may lead to further disciplinary action, up to and including termination." [Filing No. 23 at 26.] MetLife later approved Ms. Reaves for the full amount of time that she was on leave so, consequently, the written warning was never placed in her personnel file. [Filing No. 31-1 at 17-18; Filing No. 31-1 at 24; Filing No. 31-1 at 36.]

>    *14.    Ms. Reaves's Skill Set Level*

Enrollment Brokers at Maximus had skill sets rated at "low," "regular," or "high." [Filing No. 31-1 at 14.] New Enrollment Brokers were placed on the "low" skill level, and more experienced Enrollment Brokers were raised to the "regular" skill level. [Filing No. 31-1 at 15.] On days with high call volume, Enrollment Brokers were put on the "high" skill level. [Filing No. 31-1 at 15-16.] Ms. Reaves believes that after she returned from the May-June 2019 FMLA leave, Maximus raised her skill level to "high," causing calls to come in to her "back to back to back." [Filing No. 31-1 at 14.] She believes that raising her to the "high" skill level was unnecessary, but she was able to do her work since she had been doing it "for some time," but found it "very frustrating." [Filing No. 31-1 at 14.] Maximus had other employees work on the "high" skill level on slow days. [Filing No. 31-1 at 16.]

>    *15.    Ms. Reaves's July 16, 2019 Quality Assurance Development Notice*

On July 16, 2019, Ms. Reaves received a Quality Assurance Development Notice from Ms. Pope which reflected that Ms. Reaves received a score of 100% in June 2019 for the categories "Greeting/Verification-HIPAA," "Member Education and Information," "Customer Service," "MAXE Documentation," and "Automatic Call Failure Reasons," but a score of 40% for "Call Closure." [Filing No. 23 at 37.] The Notice stated:

> Ms. Terri I do not have a lot of information on you due to your being out for most
> of May and June. You did a great job bringing up the member education score for

June, and the call closure score for June is due to only having one QA for the month. Going forward please remember to offer the survey at the end of your call and we are glad to have you back.

[Filing No. 23 at 37.]

16.    *Ms. Reaves's EEOC Charge*

On September 9, 2019, Ms. Reaves filed a Charge with the Equal Employment Opportunity Commission ("EEOC"). [Filing No. 31-1 at 22; Filing No. 31-1 at 61.]  In the Charge, Ms. Reaves alleged that she had been discriminated against from June 1, 2018 to August 26, 2019 on the basis of her race and sex.  [Filing No. 31-1 at 61.]  She stated:

I…have worked for Maximus since September 2009.  My current position is an Enrollment Broker.  The Supervisor is Greg Gadson, the HR is unknown.

I am an African American Female 55 yrs. old.  I am on FMLA, and have been on FMLA for Fibromyalgia, but I also suffer with diabetes, depression and anxiety and went out…for another FMLA claim due to that on 05/20/2019.  MetLife handled the claim and it was not completely processed when I returned to work 06/20/2019 and was written up on a Final written warning.  It was not added to my file per Gregory Gadson Supervisor.  [H]ave also been looked over for any type of promotions due to my FMLA.  I feel the culture of the Company is unfair due to race and lots of favoritism.  I feel I am being targeted because of my FMLA and Race.

I believe[ ] I am being discriminated against because of my Race-Black/African American in violation of the Civil Rights Act of 1964 as Amended, and because of my Disability in violation of the American[s] with Disabilities Act of 1990 as Amended.

[Filing No. 31-1 at 61.]  The EEOC issued a Notice of Right to Sue on September 10, 2019.  [Filing No. 1-1.]

17.    *The Lawsuit*

Ms. Reaves initiated this lawsuit on October 10, 2019, [Filing No. 1], and, after granting her Motion to Proceed *In Forma Pauperis* and screening her Complaint pursuant to 28 U.S.C. § 1915(e), the Court determined that the following claims could proceed: (1) retaliation under the

FMLA; (2) discrimination and retaliation under the ADA; and (3) discrimination and hostile work environment under Title VII.  [Filing No. 7.]

> 18.    *Ms. Reaves's Resignation*

On November 8, 2019, Ms. Reaves resigned from Maximus to take a higher-paying job with the State of Indiana.  [Filing No. 31-1 at 39-40.]

**C.    Discussion**

> 1.    *FMLA Retaliation Claim*

At the outset, the Court notes that Ms. Reaves's FMLA retaliation claim appears to be based on five actions by Maximus: (1) failing to promote Ms. Reaves; (2) giving Ms. Reaves less special project work; (3) giving Ms. Reaves a written warning when she returned from her FMLA leave in June 2019; (4) giving Ms. Reaves more difficult work by raising her skill level to high; and (5) failing to provide Ms. Reaves with her earned bonuses or decreasing her bonuses.  The Court considers each theory in turn.

> a.    <u>Failure to Promote</u>

Ms. Reaves appears to base her failure-to-promote FMLA retaliation claim on Maximus's decision not to promote her to the training manager, data entry management, or supervisor positions.  As to the training manager and data entry management positions, Maximus argues that they cannot form the basis for Ms. Reaves's FMLA claim because she did not apply for those positions.  [Filing No. 33 at 15.]  Maximus also points to Ms. Reaves's testimony that she was not interested in applying for the data entry management position because it did not involve a pay raise, and that any decision not to put Ms. Reaves into that position was not a materially adverse action because it did not involve a raise and was not a supervisory position.  [Filing No. 33 at 15.] Maximus notes that Ms. Godines, who was hired for the data management role, had also taken

FMLA leave.  [Filing No. 33 at 15.]  As to the supervisor position, Maximus argues that the conversation that Ms. Reaves overheard before her interview for the supervisor position is not enough to support her FMLA retaliation claim because Ms. Smith did not directly reference Ms. Reaves's FMLA leave, but only her attendance in general, and that Mr. Gadson was hired over Ms. Reaves for numerous non-retaliatory reasons including that Mr. Gadson had experience directly relevant to the supervisor position.  [Filing No. 33 at 13-14.]  Maximus also notes that Ms. Glover had no knowledge that Ms. Reaves had been approved for FMLA leave or had previously taken FMLA leave, nor was her FMLA leave discussed during the decision-making process.  [Filing No. 33 at 14.]  Additionally, Maximus states that Ms. Reaves herself testified that she believed Maximus already knew they were going to hire Mr. Gadson before the interviews.  [Filing No. 33 at 14.]

In her response, Ms. Reaves focuses on the supervisor position and argues that Ms. Glover was aware that Ms. Reaves had taken FMLA leave.  [Filing No. 38 at 2-3.]  She also states that she had worked for Maximus longer than Mr. Gadson, and that she also interviewed for a trainer position.  [Filing No. 38 at 3.]  Further, she states that Ms. Glover did not explain in her Declaration "what changes [Mr. Gadson] said he would make and whether [Maximus] implemented the suggested changes."  [Filing No. 38 at 3.]  Ms. Reaves also relies upon her overhearing Ms. Smith tell Ms. Glover that they should not hire Ms. Reaves because she "had a disability and was on FMLA."  [Filing No. 38 at 3.]

In its reply, Maximus argues that merely being employed longer than Mr. Gadson did not make Ms. Reaves more qualified for the supervisor position, and that Ms. Reaves's complaint that Ms. Glover did not provide more details in her Declaration related to Mr. Gadson's interview is not valid.  [Filing No. 42 at 3-4.]  Maximus argues that Ms. Reaves was offered a training position

16

in 2012 or 2013 but turned it down, and that she did not apply for the training manager position that became available in late 2018. [Filing No. 42 at 4.] Maximus contends that Ms. Reaves's argument that Ms. Smith told Ms. Glover "that Plaintiff had a disability and was on FMLA and that it would be problematic if she promoted Reaves" is an unsworn statement, and is not supported by any admissible evidence. [Filing No. 42 at 4.] It asserts that this statement is very different from Ms. Reaves's deposition testimony, in which she stated that Ms. Smith said "Why would we interview her? She don't even come to work." [Filing No. 42 at 4-5.] Finally, Maximus argues that Ms. Reaves's assertion that Ms. Glover asked Ms. Reaves about FMLA and its processes and therefore knew about Ms. Reaves's FMLA leave does not conflict with Maximus's position that Ms. Glover did not know about Ms. Reaves's FMLA leave in June 2018, when Ms. Reaves applied for the supervisor position. [Filing No. 42 at 5.]

The FMLA prohibits employers from discharging or otherwise discriminating against employees for exercising or attempting to exercise FMLA rights. 29 U.S.C. § 2615(a)(2), (b). A claim of retaliation requires a showing of discriminatory or retaliatory intent. *See Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010); *Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884-85 (7th Cir. 2005). In asserting a retaliation claim under the FMLA, a plaintiff may proceed under the direct or indirect method of proof. *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 823-24 (7th Cir. 2011). A plaintiff can establish a claim under the direct method by presenting evidence that: (1) she exercised or attempted to exercise rights protected by the FMLA; (2) she suffered a materially adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 670 (7th Cir. 2011). Under the indirect method in the failure-to-promote context, a plaintiff must show that: "(1) [she] engaged in statutorily protected activity; (2) [she] applied for and was qualified for

17

the position sought; (3) [she] was rejected for that position; and (4) the employer granted the promotion to someone who did not engage in statutorily protected activity, and who was not better qualified than the plaintiff." *Carter v. Chicago State Univ.*, 778 F.3d 651, 660 (7th Cir. 2015).

At the outset, the Court finds that Ms. Reaves's FMLA retaliation claims based on Maximus's failure to promote her to the training manager or data entry management positions fail as a matter of law because she has not provided any evidence that she applied for those positions. It is axiomatic that in order to succeed on a failure-to-promote claim, a plaintiff must first show that she actually applied for the position. *Carter*, 778 F.3d at 660 (plaintiff's failure-to-promote retaliation claim failed where he "failed to express interest in being considered for the [promotion]"). Ms. Reaves has not done so for the training manager or data entry management positions, and she cannot succeed on an FMLA retaliation claim related to Maximus's failure to promote her to those positions.

That leaves Maximus's decision not to promote Ms. Reaves to the supervisor position, and the Court first considers whether Ms. Reaves has provided evidence sufficient to support her claim under the direct method of proof. Ms. Reaves focuses on her overhearing Ms. Smith discussing her application with Ms. Glover, and argues in her response brief that Ms. Smith said to Ms. Glover that Ms. Reaves "had a disability and was on FMLA and that it would be problematic if she promoted [Ms. Reaves]." [Filing No. 38 at 3.] But this statement by Ms. Reaves is not supported by record evidence.[3] In fact, Ms. Reaves testified in her deposition only that Ms. Smith asked Ms.

---

[3] Some of the documents Ms. Reaves submits are not properly authenticated and/or their significance is neither explained by Ms. Reaves nor apparent to the Court. For example, Ms. Reaves submits what appears to be a chat or instant message conversation between herself and Ms. Pope in March 2019 in which they discuss Ms. Reaves looking for a new position at other companies. [Filing No. 23 at 30.] But the document is not admissible because it is not properly authenticated, and Ms. Reaves failed to explain how it is relevant.

Glover why they should even interview Ms. Reaves because "[s]he don't even come to work." [Filing No. 31-1 at 19.]  This statement by Ms. Smith is not sufficient to show that Ms. Smith felt they should not promote Ms. Reaves because she had taken FMLA leave.  It does not even show that Ms. Smith was aware that Ms. Reaves had taken FMLA leave or that Ms. Reaves had a disability.  Further, Ms. Glover stated in her Declaration that she and Ms. Smith did not discuss Ms. Reaves's FMLA leave or medical conditions when they decided who to hire for the supervisor position.  [Filing No. 31-2 at 3.]  Ms. Reaves has not provided any evidence that Maximus's decision not to promote her to the supervisor position was linked in any way to her FMLA leave, and her FMLA retaliation claims fails as a matter of law under the direct method.

Under the indirect method, Ms. Reaves argues that she was treated less favorably than Mr. Gadson, who was ultimately promoted to the supervisor position, and that Ms. Glover did not provide adequate details regarding Mr. Gadson's interview answers.  Ms. Reaves's argument that she was employed at Maximus longer than Mr. Gadson is unavailing.  Simply being employed for a longer period of time does not show that Ms. Reaves was more qualified than Mr. Gadson, who – unlike Ms. Reaves – had already been performing supervisory duties, and who Ms. Glover and Ms. Smith felt also provided better answers than Ms. Reaves during his interview.  In any event, the Court "does not act as a superpersonnel department." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) (internal quotation omitted).  Instead, it looks only to whether Maximus's explanation for hiring Mr. Gadson over Ms. Reaves is supported by a legitimate reason, and not at whether it was the best decision.  *See Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) ("[T]he only question is whether the employer's proffered reason [for the adverse employment action] was pretextual, meaning that it was a lie") (quotation and citation omitted); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) ("[I]t is not our role to determine the competency

19

of or interfere in employment decisions simply where we believe an employer has made a poor choice. Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair"). Ms. Reaves has not provided any evidence indicating that Maximus's reasons for hiring Mr. Gadson – that he had already served in a supervisory role, and that he performed better than Ms. Reaves during the interview process – were a pretext for FMLA retaliation. Accordingly, her FMLA retaliation claim based on Maximus's decision not to promote Ms. Reaves to the supervisor position fails under the indirect method of proof as well.

          b.    <u>Other Actions</u>

Ms. Reaves also bases her FMLA retaliation claim on her contentions that she received less special project work than other employees, that she was assigned more difficult work, that she was issued a written warning, and that Maximus failed to provide her with her earned bonuses and/or decreased her bonuses. Maximus argues that none of these actions constitutes an adverse employment action, and that the evidence undercuts her claims. [Filing No. 33 at 17-19.]

In her response, Ms. Reaves only addresses the bonus issue, arguing that she has submitted documents showing that she was entitled to the bonuses, and that Maximus has not explained how the errors were made, who made the mistakes, or "what happened to the money designated in the computer as [her] bonuses." [Filing No. 38 at 4.]

Maximus argues in its reply that Ms. Glover's testimony on the bonus issue is admissible, and that Ms. Reaves has not presented any evidence that she was entitled to the bonuses. [Filing No. 42 at 5-6.]

Because Ms. Reaves did not address Maximus's arguments relating to Ms. Reaves's claims that she received less special project work than other employees, that she was assigned more

difficult work, or that she was issued a written warning, the Court finds that she has waived any argument in opposition and has abandoned her claims based on those actions.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver"); *Laborers' Intern. Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (holding that arguments not presented in response to motion for summary judgment are waived); *De v. City of Chicago*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012) ("Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of [her] claims").

As to Maximus's alleged failure to provide her with earned bonuses and/or decreasing her bonuses, Ms. Reaves bases her claim entirely on the bonus history documents which she argues showed that she was entitled to, and did not receive, certain bonuses.  But Ms. Glover explained in her Declaration that there were errors when compensation data was imported into Maximus's new human resources system, and that the bonus amounts reflected on the bonus history documents were inaccurate.  [Filing No. 31-2 at 4.]  Ms. Reaves has not produced any evidence which contradicts Ms. Glover's explanation.  In short, she has not shown that Maximus failed to pay her a bonus to which she was entitled nor that, even if it had, such a failure had anything whatsoever to do with her taking FMLA leave.

In sum, Ms. Reaves's FMLA retaliation claims based on a failure to promote her, receiving less special project work than other employees, being assigned more difficult work, being issued a written warning, or not receiving a certain bonus fail as a matter of law, and the Court **GRANTS** Maximus's Motion for Summary Judgment on those claims.

2.    *ADA Discrimination and Retaliation Claims*

Maximus argues in support of its Motion for Summary Judgment that Ms. Reaves's discrimination and retaliation claims under the ADA fail for the same reasons her FMLA retaliation claim fails.  [Filing No. 33 at 20-22.]

In her response, Ms. Reaves sets forth the same arguments she asserted in support of her FMLA retaliation claim.  [Filing No. 38 at 3-4.]

Maximus reiterates its arguments in its reply brief.  [Filing No. 42 at 5-6.]

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  A claim for disparate treatment based on disability under the ADA "requires proof that: (1) the plaintiff was disabled; (2) the plaintiff was otherwise qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of the adverse employment action." *Castetter v Dolgencorp, LLC,* 953 F.3d 994, 996 (7th Cir. 2020) (citing *Scheidler v. Indiana,* 914 F.3d 535, 541 (7th Cir. 2019)). A claim of retaliation under the ADA requires proof that "[the plaintiff] engaged in protected activity, that she suffered an adverse action, and that there is a causal connection between the two." *Rowlands v. United Parcel Serv. - Fort Wayne,* 901 F.3d 792, 801 (7th Cir. 2018).

For the same reasons that the Court has discussed above, Ms. Reaves's discrimination and retaliation claims under the ADA based on a failure to promote fail. *Burnett v. LFW Inc.,* 472 F.3d 471, 481 n.5 (7th Cir. 2006) ("[W]e assess a claim of FMLA retaliation in the same manner that we would evaluate a claim of retaliation under other employment statutes, such as the ADA…."). She has not presented any evidence that Maximus's decision not to promote her to the supervisor

22

position had anything to do with her disability, or with her exercising a statutorily protected right under the ADA. And as with her FMLA retaliation claim, her failure to apply for the training manager or data entry management positions is fatal to her failure-to-promote claims under the ADA related to those positions. Further, Ms. Reaves has not presented any evidence showing that her disability, or the exercise of a statutorily protected right under the ADA, had anything to do with Maximus giving her more difficult work, reducing her special project work, issuing her a written warning, or failing to pay her a certain bonus.

Ms. Reaves has not presented evidence which would "permit a reasonable factfinder to conclude" that Maximus failed to promote her, gave her more difficult work, gave her less special project work, issued a written warning, or failed to pay her earned bonuses and/or paid her decreased bonuses because of her disability, or because of any activity protected under the ADA. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Maximus's Motion for Summary Judgment as to Ms. Reaves's ADA discrimination and retaliation claims is **GRANTED**.

### 3. Title VII Race Discrimination and Hostile Work Environment Claims

#### a. Discrimination Claim

Maximus argues that Ms. Reaves's Title VII discrimination claim fails because she "has no evidence that she was not hired for the supervisor, training manager, or data management position because of her race." [Filing No. 33 at 22 (emphasis omitted).] It notes that the comment Ms. Smith made to Ms. Glover before Ms. Reaves's interview for the supervisor position had nothing to do with race, and Maximus ultimately hired an African American person for the supervisor and training manager positions. [Filing No. 33 at 22.] Maximus reiterates its argument that being given more difficult work, less special project work, and a written warning are not adverse

23

employment actions, and that the bonus history spreadsheets were inaccurate due to a data error. [Filing No. 33 at 23.]

Ms. Reaves does not specifically address her race discrimination claim in her response brief. [*See* Filing No. 38.]

Title VII of the Civil Rights Act of 1964 forbids an employer from discriminating against any individual with respect to her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "To survive summary judgment on a Title VII discrimination claim, a plaintiff must present evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Milligan-Grimstad*, 877 F.3d at 710 (quotation and citation omitted). "[T]he singular question that matters in a discrimination case [is]: Whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the…adverse employment action." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz*, 834 F.3d at 765). A plaintiff may rely on both direct and circumstantial evidence to support an inference of causation and intent. *Joll v. Valparaiso Comm. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). A plaintiff can also "enlist the burden-shifting framework of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]" "[t]o clarify and to simplify her task." *Joll*, 953 F.3d at 929 (quotation and citation omitted). The Court's focus is to "consider[ ] [the evidence] as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of Chief Judge of Cook Cnty., Ill.*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765). In determining whether the evidence would permit a reasonable factfinder to conclude that Ms.

Reaves's race caused her to be treated unfairly, "the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wis. Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017) (quotation and citation omitted).  But the Court "review[s] the evidence holistically to see if it permits an inference of race discrimination." *Lloyd v. Mayor of City of Peru*, 761 F. App'x 608, 610 (7th Cir. 2019).

Ms. Reaves's Title VII race discrimination claim fares much the same as her FMLA and ADA claims.  For her failure-to-promote theory, Ms. Reaves has not presented any evidence that Maximus failed to promote her to the supervisor position due to her race, or that it treated white employees more favorably than her.   Indeed, Maximus ultimately hired Mr. Gadson, who is African American, for the supervisor position.  Ms. Reaves did not apply for the training manager position or the data entry management position, so any failure to promote her to those positions cannot form the basis for a race discrimination claim.  *See Riley v. Elkhart Comm. Schs.*, 829 F.3d 886, 892 (7th Cir. 2016) (plaintiff's race discrimination claim based on a failure to promote her to academic dean position failed where plaintiff did not apply for the position).

As for her claim that she received less special project work than some white employees, [*see* Filing No. 1 at 8 (Ms. Reaves alleging in her Complaint that some Caucasian employees were given more special project work than her)], Ms. Reaves testified that one of the white employees who received a lot of special project work went "above and beyond" what she was asked to do, and another was bilingual and could communicate with Spanish-speaking members.  [Filing No. 31-1 at 9.]  Additionally, Ms. Reaves testified that another African American employee received special project work "quite often." [Filing No. 31-1 at 10.]  The evidence Ms. Reaves has presented

would not allow a reasonable factfinder to conclude that race had anything to do with the amount of special project work to which she was assigned.

Ms. Reaves does not address her allegation that she received more difficult work or that she received a written warning in connection with her race discrimination claim, and has waived any argument in support of those claims. *Laborers' Intern. Union of North America*, 197 F.3d at 1197. As for her allegation that Maximus did not pay her earned bonuses and/or paid her a decreased bonus, Ms. Reaves testified that two other African American employees did not receive the correct bonus. [Filing No. 31-1 at 32.] But Ms. Reaves has not provided any evidence that Maximus paid white employees the amount on the spreadsheet that she saw – a spreadsheet that Ms. Glover testified reflected inaccurate information due to a data entry error. In short, Ms. Reaves has not presented evidence that Maximus failed to pay her an earned bonus, nor that, even if it had, such a failure had anything to do with her race. Ms. Reaves's race discrimination claim fails as a matter of law, and the Court **GRANTS** Maximus's Motion for Summary Judgment on that claim.

b.    Hostile Work Environment

Maximus argues that Ms. Reaves's allegations do not support a hostile work environment claim because "there is no evidence showing [she] was not promoted or was subjected to unfair treatment…because of her race," and "even if there were such evidence, these allegations would not amount to severe or pervasive conduct." [Filing No. 33 at 24.] Maximus also contends that the comment regarding Debbie's likely reaction to Ms. Reaves seeing the picture of her granddaughter, and Debbie's comment about Maximus needing to hire more white people are not sufficient to show that Ms. Reaves was subject to a hostile work environment. [Filing No. 33 at 24-25.] It asserts that the comment about Debbie's granddaughter is hearsay and "only reflects

[Stacy's] opinion about how [Debbie] would react," and that the other comment "was not directed toward [Ms.] Reaves and occurred years before her resignation." [Filing No. 33 at 25.]

Ms. Reaves does not specifically address her hostile work environment claim in her response brief. [*See* Filing No. 38.]

In order to succeed on a hostile work environment claim under Title VII, a plaintiff must show that: "(1) she was subject to unwelcome harassment; (2) the harassment was based on [a characteristic or category protected by Title VII]; (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is [a] basis for employer liability." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*, 804 F.3d 826, 833-34 (7th Cir. 2015) (citation omitted). In determining whether plaintiff has shown that a work environment was objectively hostile, the Court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance," and also "the relationship between the harassing party and the [party being] harassed." *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (citations omitted). Although the workplace need not be "hellish," it must be "so pervaded by discrimination that the terms and conditions of employment are altered." *Id.* (citations omitted).

The evidence, even when viewed in the light most favorable to Ms. Reaves, is not sufficient to withstand Maximus's Motion for Summary Judgment. As discussed above, Ms. Reaves has not presented evidence from which a reasonable jury could conclude that her treatment was related to her race. Additionally, Stacy's comment regarding how she believed Debbie would react to learning that Ms. Reaves had seen the picture of her granddaughter and Debbie's comment about

hiring more white people are two isolated comments made to Ms. Reaves's co-workers.[4]  Title VII is "not… a general civility code," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation and citation omitted), and while Debbie's predicted response and her comment are disturbing, neither they nor the other evidence Ms. Reaves has presented represent the type of severe or pervasive conduct that Title VII is intended to remedy.  *See Alamo*, 864 F.3d at 552 (in order to succeed on hostile work environment claim, employee must be subjected "to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [her] workplace environment"). Consequently, the Court **GRANTS** Maximus's Motion for Summary Judgment as to Ms. Reaves's Title VII hostile work environment claim.

## III.
### CONCLUSION

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accepts its version of events." *Schact v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999).  Ms. Reaves has not presented evidence that would allow a reasonable trier of fact to conclude that she was not promoted or was otherwise treated unfairly due to her FMLA leave or her disability, or was discriminated against due to her disability or her race.  She also has not presented evidence sufficient to establish that she was subjected to a hostile work environment.  For the foregoing reasons, the Court **OVERRULES** Ms. Reaves's Objection to Declaration of Courtney Glover, [37], and **GRANTS** Maximus's Motion for Summary Judgment, [31], as to all of Ms. Reaves's claims.  Final judgment shall enter accordingly.

---

[4] Although neither Ms. Reaves nor Maximus discuss it in their briefs, Ms. Reaves also testified at her deposition that she overheard Ms. Godines, who is white, call an African American employee a "dumb f**k."  [Filing No. 31-1 at 30.]  While certainly unkind and demeaning, this comment, which was not directed at Ms. Reaves, is not necessarily related to race and does not support a hostile work environment claim.

Date: 1/26/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

**Distribution via United States Mail to:**

Terri Lynn Reaves
4929 Thrush Dr.
Indianapolis, IN 46224